**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TUOMAS KRISTIAN MIRTTI,           )
                                  )
             Petitioner,          )        Civil Action No. 1:24-77
                                  )
v.                                )        Judge Cathy Bissoon
                                  )
KRISTINA ELIZABETH MIRTTI,        )
                                  )
             Respondent.          )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this lawsuit, Petitioner, Tuomas Kristian Mirtti. ("Mr. Mirtti" or "Petitioner"), seeks a return of his daughters, L.J.M and E.A.M., to Finland from the United States pursuant to the Hague Convention on the Civil Aspects of Child Abduction ("Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.* (Doc. 1). Respondent, Kristina Elizabeth Mirtti, Mr. Mirtti's wife and the mother of the children ("Mrs. Mirtti" or "Respondent"), opposes the petition. (Doc. 7). Having conducted a full evidentiary hearing on May 20, 2024, and reviewed the parties' submissions, including their Proposed Findings of Fact and Conclusions of Law (Docs. 21-24), the Court issued an Order on May 31, 2024, denying the Petition and indicating that a Memorandum Opinion fully detailing the Court's reasons for its decision would be issued in due course. (Doc. 25). In accordance with that Order, the Court hereby explains its ruling as follows:

### I.      FINDINGS OF FACT

1.       Petitioner is a Finnish citizen who currently resides in Espoo, Finland, near Helsinki. (Hearing Transcript (Doc. 20, "Tr.") at 13:22-14:1).

2.      Petitioner is a medical doctor, with a specialty in urological pathology.  (Tr. at 14:2-4, 17:7-11).

3.      Since 2009, Petitioner has worked as a researcher at the University of Helsinki, as well as a pathologist at the University Hospital.  (Tr. at 14:2-15 and Pet. Exs. 2, 3).

4.      Respondent was born in the United States and is a United States citizen.  (Tr. at 100:3-6).

5.      Respondent is an attorney by profession.  (Tr. at 203:19-20).

6.      In the summer of 2010, Petitioner and Respondent met in Philadelphia, Pennsylvania, where Respondent was working in a law firm.  (Tr. at 17:12-16).

7.      In or around March 2011, Respondent moved to Finland, where Petitioner resided.  Although she was unable to practice law in Finland, Respondent worked in a Finnish law firm initially, and then worked independently, operating her own translation business.  (Tr. at 17:21-22; 173:4-174:4).

8.      Petitioner and Respondent were married on May 23, 2015, in Finland.  (Tr. at 17:23-18:2, 8-10, and Petitioner Exhibit ("Pet. Ex.") 5).

9.      Petitioner and Respondent have two daughters together.  The oldest daughter, L.J.M., was born on September 14, 2015, and the youngest daughter, E.A.M., was born on February 2, 2019.  (Tr. at 21:7-20 and Pet. Ex. 7).

10.      At the time of the Hearing, L.J.M. was 8 years old, and E.A.M. was 5 years old.  *See* id.

11.      L.J.M. and E.A.M. are dual United States and Finnish citizens.  (Tr. at 40:15-21).

12.      Petitioner, Respondent, L.J.M. and E.A.M. (the "Mirtti Family") resided together until July 2022 in a home they owned in Espoo, Finland.  In addition to the Espoo home, the

Mirttis own a small, rustic, seasonal sea cottage in Kakskerta, Finland.  (Tr. at 32:9-11, 174:5-16).

13.     Petitioner also has two children from a prior marriage:  a son, Akseli, age 18, and S.P., a daughter, age 17, at the time of the Hearing.  Both Akseli and S.P. reside in Finland and lived with the Mirtti family part-time prior to the Mirtti family's departure to the United States. (Tr. at 19:2-20; 20:9-22).

14.     Petitioner's parents live near Turku, Finland, approximately two hours from where the Mirtti family resided in Espoo.  (Tr. at 34:19-25).

15.     In Espoo, L.J.M. and E.A.M. attended school/day care, visited with family and friends, went on outings, and participated in activities such as dance class and swim class.  (Tr. at 22:21-24:13, 34:10-18 & Pet. Exs. 8, 9, 10).

16.     In 2022, Petitioner accepted a one-year appointment to work in the United States as a Visiting Associate Professor of Biomedical Engineering at Emory University in Atlanta, Georgia.  The appointment was set to begin on August 1, 2022 and end on July 31, 2023.  (Tr. at 24:15-25:16; Pet. Ex. 11).

17.     Petitioner was legally permitted to live and work in the United States under a J-1 Scholar Visa that expired on July 31, 2023.  (Tr. at 31:10-15; Pet. Ex. 16).

18.     During his visiting professorship, Petitioner also remained employed by the University of Helsinki, under an employment contract that ran from January 1, 2021, through August 31, 2023.  (Tr. at 15:8-16:3; Pet. Exs. 3, 12).

19.     Prior to leaving for Atlanta, the Mirtti Family leased their home in Espoo for one year, forwarded their mail to the United States for one year and placed furniture and other personal items in storage in Finland.  (Tr. at 31:20-25, 32:5-8).  Mr. and Mrs. Mirtti also

3

corresponded with school and daycare personnel regarding school placement for L.J.M. and

daycare placement for E.A.M. for the 2023 school year.  For example, on May 5, 2022,

Respondent wrote to the rector of a bilingual Finnish-English program to which L.J.M. had been

accepted asking about the possibility for a deferral of L.J.M.'s start for one year.  (Doc. 2, Ex. 8).

On May 22, 2022, Petitioner wrote to E.A.M.'s Finnish daycare to confirm that the daycare

would hold a place for E.A.M. for August 2023. Id.

20.     Family friend, Simon Rozner, testified at the hearing that the Mirttis informed

him in Spring 2022 that they would be traveling to Atlanta for a year due to Petitioner's visiting

scholar opportunity at Emory.  Mr. Rozner also testified as to text messages he subsequently

exchanged with Respondent about school placements for L.J.M. and Mr. Rozner's child, E.R.,

who were friends.  In one of the messages admitted into evidence, Respondent indicated that she

had declined L.J.M.'s placement in an English-Finnish bilingual program because the family

would be spending the year in Atlanta.  (Tr. at 5:18-11:18 & Pet. Ex. 1).  Mr. Rozner testified

that he did not have any additional conversations with Respondent after Spring 2022 regarding

the family's plans.  (Tr. at 12:15-24).

21.     Mr. and Mrs. Mirtti, however, left open the option of relocating from Finland,

including the possibility of remaining in the United States.  Illustratively, on January 18, 2022,

Petitioner emailed Respondent about the benefits of the visiting professorship opportunity.

Among the benefits Petitioner listed was: "Having a chance to think about the future-living plans

more broadly, having all options on the table.  This means also that I have a better chance of

looking at the job options and network in the States."  (Tr. 81:4-82:7 & Pet. Ex. 15).  Although

Petitioner told Respondent that "[m]oving to the States at this point cannot automatically mean

that we move there for good and forever," he left all potentialities open, stating that "[m]oving

back to Espoo or moving to Turku or making the decision to stay in the US are all options that need to be open.  Also there might be some other good possibilities like Toronto/Canada if something good appears."  Id.   When pondering the status of L.J.M.'s school position later in the email, Petitioner wondered whether "Turku would have options for English school *when/if* returning?"  Id. (emphasis added).

22.     Mrs. Mirtti and the two children flew to Atlanta on one-way tickets or about July 5, 2022, and, after a brief stay in Atlanta, traveled to Warren, Pennsylvania, for several weeks to visit Mrs. Mirtti's parents and siblings who reside there.  (Tr. at 22:9-17; 157:2-22, 195:2-196:2, 197:10-18).  Mr. Mirtti flew to the United States shortly thereafter and met Mrs. Mirtti and the girls in Atlanta.  (Tr. at 157:2-22).

23.     When the parties left Finland, they sold their only car and purchased a new car in Atlanta.  (Tr. at 83:14-20, 183:4-9).

24.     They also bought personal property with them, including clothing, bedding, documents and the toys and stuffed animals that were special to the children.  (Tr. at 154:7-16). The Mirttis left behind the family dog and an e-bike that Respondent had purchased in May 2022. (Tr. at 33:10-16, 34:1-3, 35:1-2, 175:2-173:8).

25.     In Atlanta, the Mirtti family resided in a rented single-family home in a residential neighborhood.  (Tr. at 85:10-17, 157:23-158:4).

26.     While in Atlanta, Petitioner worked at Emory, and Respondent continued her sole proprietorship as a proofreader/media consultant.  (Tr. at 28:18-29:11, 155:21-156:2).

27.     In Atlanta, L.J.M. was enrolled in first grade in the neighborhood public school, and E.A.M. was enrolled in a preschool program.  (Tr. at 36:12-16, 155:18-20).

28.     The Mirtti family engaged in other activities and routines in Atlanta, including celebrating holidays such as Halloween with neighbors, playing youth sports and visiting Respondent's family in Warren, Pennsylvania. (Tr. at 153:5-11, 155-56, 158:10-19 & Pet. Ex. 19-1).

29.     In or around March 2023, the Mirttis decided not to renew the Atlanta lease when it expired on May 31, 2023.  Instead, they planned that Respondent would travel to Warren, Pennsylvania, with the girls when the lease expired, while Petitioner finished his term at Emory. On March 30, 2023, Respondent emailed the leasing agent, indicating the family would not be renewing the lease "since Tuomas's work at Emory will be wrapping up and we'll be returning home."  (Pet. Ex. 20).  On May 31, 2023, Respondent filled the car with their belongings from the Atlanta house, and she and the children drove north to Warren, to her parents' home.  As they had agreed, Petitioner remained in Atlanta, living in a smaller, less expensive apartment. (Tr. at 37:14-38:24, 46:13-22, 85:18-86:19, 165:17-167:15 & Pet. Ex. 19-1).

30.     Petitioner was aware at all times of Respondent's plan to travel to Warren, Pennsylvania at the end of May 2023, and intended to meet her and the children in Warren after he completed his work at Emory at the end of July 2023.  (Tr. at 37:22-38:1, 46:13-22, 165:17-166:23 & Pet. Ex. 19).

31.     At the Hearing, Respondent credibly testified that around Halloween, 2022, she and Petitioner began discussing the possibility of remaining in Atlanta after Petitioner's employment with Emory ended.  (Tr. at 158:5-21).  Respondent further credibly testified that, in the spring of 2023, she and Petitioner began discussing the possibility of moving to locations in the United States other than Atlanta.  (Tr. at 158:23-159:7).  Petitioner was unsure whether Emory could continue to employ him past August 2023, and discussed looking for employment

options in other United States locations, such as Cleveland, Ohio, or Johns Hopkins in Maryland. Id.  No later than March 2023, Petitioner began talking to colleagues about potential job opportunities in the United States.  (Tr. at 138:16-139:12, 158:23-159:17 & Resp. Exs. D8, D9).

32.     Respondent testified that from January 2023 onwards, the couple talked weekly about the family remaining in the United States, and the couple's discussions about whether or not to return to Finland continued throughout the spring of 2023.  (Tr. at 94:3-12, 153:6-11, 160:14-161:9, 162:4-9).  She stated that Petitioner initially was receptive to the idea, and that, in March 2023, they discussed the possibility of submitting a green card application for him based on marital status, in addition to the job inquiries discussed above that he was making to professional contacts in the United States.  Petitioner, in contrast, testified that Respondent did not tell him until April 2023 that she thought that the family should stay in the United States instead of returning to Finland.  (Tr. at 40:12-19, 94:3-12).  Petitioner stated that he grew concerned and told Respondent that her desire to remain in the United States went against their prior agreement to return.  (Tr. at 41:13-21).  Although the parties dispute the exact timeline and tenor of their discussions, they agree that at some point in early-2023, they talked further about the possibility of remaining in the United States instead of returning to Finland at the end of July.

33.     At one point around mid-May 2023, the couple's discourse on the topic became heated, resulting in Petitioner physically taking the children's passports from Respondent's hands and briefly leaving the Atlanta home with them.  (Tr. at 163:13-164:20).  After several minutes, Petitioner returned to the house and gave the passports back to Respondent.  (Tr. at 164:13-20).  Petitioner testified that, at or around this time, he also reached out to an NGO for abducted children in Finland expressing his concern that Respondent was planning to remain in the United States with the children and did not intend to return to Finland.  He further testified

that he did not contact a lawyer or take any other measures at this time because he had been advised to negotiate with his wife.  (Tr. at 41:17-23, 42:13-18).[1]

34.     On May 31, 2023, the family's last day in the Atlanta house, Petitioner purchased four one-way tickets from Cleveland, Ohio, to Finland for himself, Respondent, L.J.M.  and E.A.M. for July 31, 2023.  (Tr. at 43:21-45:5 & Pet. Ex. 22).  Petitioner intentionally purchased flexible tickets, which could be changed at any time.  *See* id.  The parties dispute whether or not Respondent knew Petitioner was buying the airline tickets.  Having observed both parties' testimony on this topic, the Court finds credible Respondent's testimony that Petitioner purchased the tickets without her knowledge.  The Court finds Petitioner's contrary testimony not credible.  (Tr. at 44:12-14, 91:22-92:3, 162:10-22 & Pet. Ex. 22).

35.     During the summer of 2023, Mr. and Mrs. Mirtti communicated with each other frequently, including in a series of WhatsApp messages admitted into evidence as Petitioner's Exhibit 23 and Respondent's Exhibit 8, and iPhone messages admitted as Petitioner's Exhibit 19.

36.     On or about July 5 and July 6, 2023, Petitioner sent Respondent several WhatsApp messages asking about school arrangements for L.J.M. in Finland for the upcoming school year.  Respondent did not reply.  (Tr. at 46:23-48:7 & Pet. Ex. 23-3-5).  Later on July 6, 2023, Petitioner messaged Respondent that he had received an email indicating that E.A.M. had been registered for Pre-Kindergarten in Warren, PA for the 2023-24 school year.  Petitioner asked Respondent to explain what was going on and if she had "some plans to stay in Warren with the kids."  (Tr. at 46:8-17 & Pet. Ex. 19-5).

---

[1] Petitioner attempted to introduce e-mails between himself and the NGO into evidence, but the documents were not admitted because they were not among the translated documents that were stipulated to as required by the Court.  (Tr. at 43:7-19).

37.     On or about July 7, 2023, Mrs. Mirtti responded to Petitioner questioning why he

was messaging her about moving and stating:

> As I have told you repeatedly, the girls and I are staying in the USA and we are expecting
> you to join us here again after you have wrapped up your commitments in Finland.  Now
> when you send me messages like these, it makes me th[ink] that you are not intending to
> respect our discussions about living our life in the USA.  Are you refusing to continue the
> plans that we have agreed?  We are settled here, our life is here.  As you are well aware,
> [E.A.M.] has been registered for preschool here in PA and [L.J.M.] will attend school here.
> I truly hope that you will respect our plans and get your things in Finland in order and that
> then you will rejoin us in the USA and we will then rationally plan our family life.

(Tr. at 48:18-49:2 & Pet. Ex. 23-5).

38.     Petitioner responded in disagreement, stating, *inter alia*:

> This is totally untrue.  I am sending you messages about the moving arrangements because
> that's what we have agreed on.  You have not told me about your plan to stay in the US,
> but rather we have agreed that we all go back to Finland now and then, when I find a
> suitable job, we come back to the US.  Why are you doing this?  You are breaking your
> promise.

(Tr. at 49:24-50:4 & Pet. Ex. 23-6-7).

39.     Over the ensuing days, Petitioner and Respondent continued to message each

other, asserting their respective positions.  (Tr. at 50:16-23 & Pet. Ex. 23-7-9).[2]

40.     Petitioner testified that he still chose not to contact an attorney regarding

Respondent's intention to remain in the United States because he did not want to "make a fight

for this."  Rather, he wanted to negotiate with Respondent, protect the children and save the

marriage without legal intervention.  (Tr. at 50:24-51:6).

---

[2] To the extent the parties' stories conflict, the Court finds Respondent's testimony regarding the
timeline of events and the agreement reached to be credible and consistent with Petitioner's
admitted United States job search efforts.  Nevertheless, as described more fully below, it is clear
that by mid-July 2023, Petitioner had agreed that the children would remain in the United States
with Respondent after his visa expired, and that he would rejoin the family in the United States
as soon as he was able.

41.     On or about July 10, 2023, the couple had a phone conversation during which they discussed their relationship and their living situation.  After this call, the parties exchanged affectionate WhatsApp messages, and Respondent told Petitioner that she would send him her "attempt to write up what we agreed."  (Tr. at 52:9-25, 167:16-168:5 & Pet. Ex. 23 at 12-14).

42.     Shortly thereafter, Respondent sent Petitioner an e-mail containing her write-up. The agreement specifically provided that: "the girls and I can continue to live in the USA, *until you and I would <u>agree</u> otherwise*, . . . ."  (Resp. Ex. D2 (emphasis added)).  The draft also contained promises that Respondent would help Petitioner seek work in the United States and apply for a green card and that they would work on their marriage together with the aim of remaining together as a family "for life."  <u>Id.</u>

43.     Petitioner responded to the e-mail expressing disappointment that the couple would not be returning to Finland, but acknowledging his agreement to the family remaining in the United States.  *See* Resp. Ex. D2.  Petitioner's email also discussed his plans to sell their Finnish home as soon as the market improved.  In closing, Petitioner asked Respondent to review his proposed edits to the draft written agreement, stating that, "After all the whining above, I want us all to be happy.  We need to come over the challenges of our 'homelands' in different continents and arrange our life together the best we can.  Let's hope this unfortunate separation time goes quickly."  <u>Id.</u>

44.     Petitioner's proposed changes to the draft agreement are set forth in the redline version admitted as part of Respondent's Exhibit D2.  (Tr. at 106:19-24, 125:20-126:4 & Resp. Ex. D2).  Importantly, although Petitioner suggested numerous additions and other edits, he did not make any changes to the line stating that:  "the girls and I can continue to live in the USA, until you and I would agree otherwise. . . ."  (Tr. at 106:19-107:3 & Resp. Ex. D2).  Respondent

incorporated Petitioner's proposed edits and made several, additional non-substantive changes. (Tr. at 125:20-126:4 & Resp. Ex. D2).

45.     Between July 11 and July 19, 2023, the parties exchanged numerous messages reflecting Petitioner's hesitation to sign the agreement.   In these communications, Petitioner did not disavow the substance of the agreement; however, he questioned the need to put it in writing. (Tr. at 53:6-19 & Pet. Ex. 23 at 17-29).

46.     On July 18, 2023, amidst growing anxiety, Respondent e-mailed Petitioner attaching form agreements from her attorney that she suggested they use to memorialize their agreement in a format that could be signed and recorded.   Respondent also told Petitioner that, alternatively, they could sign the draft agreement they had prepared together, and that would be sufficient.   Respondent emphasized that she was "very uncomfortable" with Petitioner's suggestion that they would not need to memorialize anything, and she expressed her desire to "record our agreement properly in order to settle this anxiety and give us a foundation for continuing to move forward together."   (Tr. at 204:21-205:11, Resp. Ex. D7-C).

47.     In his reply to the July 18, 2023 email, Petitioner strongly opposed signing the attorney-supplied forms (which he described as consistent with couples who are separating) and stated that he would "rather work with the document we drafted than these kind of forms." (Resp. Ex. D7-C).   Petitioner recognized Respondent's anxiety and asked what he could do to reassure her.   *See* id.

48.     Later that night, Petitioner messaged Respondent apologizing for his earlier e-mail and for his cold feet.   In the message, he proposed that they sign their agreement the next day after they had discussed it more.   Respondent replied with a long message thanking Petitioner for assuaging her anxiety.   (Resp. Ex. D8-G, Pet. Ex. 23 at 29).

49.     On July 19, 2023, Petitioner and Respondent both signed the written agreement they had drafted.  A true and correct copy of the signed agreement was admitted into evidence as Petitioner's Exhibit 24.  Critically, the Agreement continued to provide that "[the] children, . . . can continue to live in the USA *until Tuomas and Kristina agree otherwise*, . . . ", and Petitioner never attempted to change that term.  Pet. Ex. 24, Resp. Ex. D3 (emphasis added).  The Agreement also retained provisions relating to the parties' plans to help Petitioner obtain a green card and find work in the United States as well as their commitment to remain faithful to each other and engage in couples' therapy "with the idea that we are a lifelong family and that we each are invested in this marriage together for life."  Id.

50.     On July 20, 2023, Mr. Mirtti was served with a divorce petition filed by Mrs. Mirtti in state court in Georgia.  The summons and petition were dated July 19, 2023, and Mrs. Mirtti signed the verification on July 18, 2023.  (Tr. at 56:10-57:9 & Pet. Ex. 25).  Petitioner testified that he had no prior knowledge of the divorce filing.  (Tr. at 56:12-15, 57:10-19).

51.     Mrs. Mirtti credibly testified that she signed the divorce papers on her attorney's advice after Petitioner's hesitation and delay in signing the written agreement caused her to fear he intended to back out.  After Petitioner signed the agreement on July 19, 2023, Mrs. Mirtti instructed her attorneys not to file the divorce papers, but they had done so anyway.  Mrs. Mirtti explained the situation to Petitioner, and told him that she did not intend to pursue the divorce and that she wanted to fix their relationship and stay together consistent with their agreement. (Tr. at 110:25-111:11, 168:15-23, 170:9-171:25, 201:2-9).

52.     Also on July 20, 2023, Respondent filed a Request for Entry into the United States Department of State's Children's Passport Issuance Alert Program.  Respondent did not

tell Petitioner she had filed the Request, and Petitioner never asked her why she filed it. (Tr. at 59:4-60:16, 117:24-118:6 & Pet. Ex. 26).

53.     After discussion, the parties agreed to ask Respondent's counsel to use the already-filed divorce action to file court orders regarding custody and maintenance that would incorporate the essence of their written signed agreement. (Tr. at 179:1-24; Pet. Ex. 19-2).

54.     Consistent with this discussion, Petitioner emailed Respondent's Georgia counsel on July 26, 2023, attaching documents and stating "Here's what we have discussed yesterday with Kristina. I have understood that you would next put these into some template or provide as a template. We both want to finish this soon." The attached documents included the July 19, 2023 signed agreement, a sample separate maintenance agreement and a proposed "Addendum" to the signed written agreement. (Resp. Exs. D4, D7-D).

55.     Although it was never signed, Petitioner thought of and drafted the Addendum, which addressed, *inter alia*, Petitioner's job search in the United States, Respondent's assistance with the green card process, shared custody and child support arrangements, and Respondent's agreement to lift the divorce petition. (Tr. at 126:10-25, 187:4-19, Resp. Ex. D4, D7-D). The Addendum did not propose returning the children to Finland or oppose them remaining in Warren. Rather, consistent with the parties' discussions on the matter, the document reiterated that "The residency of [L.J.M.] and [E.A.M.] is agreed to be in the USA now and until otherwise agreed between Tuomas and Kristina." (Tr. at 187:4-19, Pet. Ex. 19-2, Resp. Ex. D4, D7-D).

56.     After visiting Respondent and the girls in Warren as previously planned, Petitioner returned to Finland on July 31, 2023, the date his visa expired. (Tr. at 62:14-16).

57.     In Warren, Mrs. Mirtti and the girls live in an apartment above a garage on her parents' property. Petitioner described the space as "normal apartment" and testified that he

would stay there with Mrs. Mirtti and the girls whenever he visited.  Photographs of the dwelling were admitted into evidence as Respondent's Exhibit D10.  (Tr. at 114:15-20, 152:2-6 & Resp. Ex. D10).

58.     Respondent is employed by Northwestern Legal Services in Warren, as a legal assistant.  Although she currently is not a licensed attorney, she is awaiting a change of her attorney status from inactive to active.  (Tr. at 156:3-12, 199:5-10).

59.     Petitioner has visited his family in Warren three times since May 2023 – in July 2023; November 2023 over Thanksgiving; and during Easter 2024.  During those visits, the Mirttis acted as a family and refrained from discussing their relationship issues in front of the children.  Petitioner admitted being intimate with Respondent on one occasion during the November visit.  (Tr. at 112:17-23, 113:12-21, 119:18-21, 120:7-9, 169:11-170:9).

60.     While in Warren, L.J.M. and E.A.M. have continued to participate in numerous family and community activities, such as attending elementary school (L.J.M.) and preschool (E.A.M.); earning high grades; spending time daily with extended family, including aunts, uncles, grandparents and cousins; going to birthday parties, swim parties and festivals; visiting amusement parks, the rodeo and other attractions; taking ice skating, swimming, golf and dance lessons; celebrating holidays and attending church services.  (Tr. 192:9-199:4 & Resp. Ex. D10).

61.     L.J.M. and E.A.M. became familiar with their Warren extended family well before the summer of 2023, having visited them on prior occasions and kept in touch regularly when they lived in Finland.  (Tr. at 196:4-197:18 & Resp. Ex. D10).

62.     In Warren, the children speak English at home and take lessons to keep up with their Finnish language skills.  Once a week, Petitioner works on L.J.M.'s Finnish with her during his phone call consistent with the July 2023 agreement.  (Tr. at 197:19-198:2).

63.    Following Petitioner's return to Finland, the couple remained in close contact via phone, email and text messaging.  Respondent kept Petitioner informed about the children's lives and activities in the United States, and Petitioner participated in frequent video calls, story times and Finnish lessons with his daughters.  (Tr. at 68:19-25 & Pet. Exs. 19, 23; Resp. Exs. D7, D8).

64.    On September 22, 2023, Petitioner emailed Respondent noting, *inter alia*, that "[w]e reached a good point in July, had constructive discussions and made common goals."  The email expressed hope that the couple could make progress on some of their goals, including finding a therapist, applying for a green card and assisting with Petitioner's job-seeking efforts. (Resp. Ex. D7E).

65.    Petitioner additionally worked on practical matters such as renting the family's home in Espoo, making arrangements for items in storage and continuing his United States job search.  (Tr. at 89:6-91:3, 122:1-124:20 & Pet. Ex. 19-3, 4).  Petitioner succeeded in quickly re-renting the Espoo home and testified that the only reason he did not try to sell the house was that the market was poor for sellers.  (Tr. at 89:9-90:13 & Pet. Ex. 19).

66.    The couple succeeded in finding a therapist and participated in marriage counseling through February 2024.  (Tr. at 115:15-116:1, 137:11-15, 168:24-169:15).

67.    On October 30, 2023, Respondent finally emailed Petitioner copies of the maintenance agreement and parenting plan that her counsel had drafted.  Petitioner wrote in the email that "[i]t would be best for us as a couple if we can get the practical matters governed by these agreements settled so we both are satisfied, and we could spend more time working on our relationship."  (Tr. at 64:10-66:15 & Pet. Ex. 28).

68.    Petitioner disagreed that the draft agreements Respondent sent represented what they had agreed to, and he did not sign the documents.  (Tr. at 66:5-11, 66:22-67:8).

69.     Petitioner testified that it was at or around this time that he contacted an attorney about initiating a request for return of the children.  On December 8, 2023, Mr. Mirtti filed Requests for Return of the Children under the Hague Convention.  (Tr. at 66:22-68:21, 69:12-15 & Pet. Exs. 29, 30).

70.     Although the requests and exhibits each totaled 33 pages in length, the requests failed to include any reference to the parties' July 2023 agreement that the children would continue to live in the United States.  (Tr. at 104:16-23, 129:24-130:5, Pet Exs. 29, 30).

71.     Petitioner did not tell Respondent that he had filed the Requests for Return.  (Tr. at 104:13-15, 175:25-176:15)

72.     Respondent testified that she did not learn of the Requests for Return until February 22, 2024, when Petitioner's counsel informed her of the filings.  (Tr. at 179:25-180:15).

73.     On December 26, 2023, Petitioner received notice that Respondent had withdrawn her divorce petition.  (Tr. at 73:8-14 & Pet. Ex. 32).

74.     Petitioner filed his own petition for divorce and custody in Finland on or about December 20, 2023.  (Tr. at 71:8-10 & Resp. Ex. D6).  As far as the Court is aware, that action is still pending.

75.     On March 15, 2024, Petitioner filed the instant action claiming wrongful retention under the Hague Convention and seeking return of the children to Finland. (Doc. 1 & Pet. Ex. 35).

76.     Based on its observations of the witnesses' testimony, demeanor, and mannerisms during the evidentiary hearing, the Court makes the following credibility determinations:

a. The Court finds Respondent's testimony described above credible, including, *inter alia*, her testimony regarding the timeline and content of the couple's discussions

16

regarding remaining in the United States, her reasons for filing the divorce petition, and her subsequent agreement not to pursue that petition.

b. The Court finds Petitioner's contrary testimony not credible. Petitioner's failure to mention the July 19, 2023 agreement in his Requests for Return, his cursory reference to the agreement in his complaint and his characterization of the agreement as a unilateral "sham" agreement prepared by Respondent, despite his making significant edits to the document and preparing a proposed addendum to the same, further weaken his credibility and cast doubt on the trustworthiness of his testimony.

c. The Court finds Mr. Rozner's testimony described above to be credible and suggestive of the parties' mindset prior to leaving Finland, but irrelevant to the parties' state of mind and/or intentions after they moved to the United States, particularly during the spring and summer of 2023 and beyond.

## II. <u>CONCLUSIONS OF LAW</u>[3]

### A.   <u>Hague Convention and ICARA</u>

1.     This Court has jurisdiction over this matter pursuant to Title 22 United States Code Section 9003(a).  <u>Blackledge v. Blackledge</u>, 866 F.3d 169, 177 (3d Cir. 2017).

2.     The Hague Convention's two primary goals are (1) "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and (2) "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected

---

[3]  The Court recognizes that many of the issues discussed below involve mixed questions of law and fact.  *See, e.g.*, <u>Monasky v. Taglieri</u>, 589 U.S. 68, 84 (2020).

in the other Contracting State." <u>Tsai-Yi Yang v. Fu-Chiang Tsui</u>, 499 F.3d 259, 270 (3d Cir.

2007) (citing Hague Convention, art. 1).

3.      It is undisputed that both the United States and Finland are Contracting States

under the Hague Convention.

4.      The Hague Convention was *not* designed to resolve international custody

disputes.  Rather, the Convention aims "to restore the status quo prior to any wrongful removal

or retention, and to deter parents from engaging in international forum shopping in custody

cases." <u>Id.</u> (quoting <u>Karkkainen v. Kovalchuk</u>, 445 F.3d 280, 287 (3d Cir. 2006)).

5.      The "core premise" of the Hague Convention is that the interests of children in

matters related to their custody "are best served when custody decisions are made in the child's

country of 'habitual residence.'" <u>Monasky v. Taglieri</u>, 589 U.S. 68, 72 (2020).

6.      Thus, under the Hague Convention, a child wrongfully removed from her country

of  "habitual residence" ordinarily must be returned to that country.  <u>Id.</u>; *see also* <u>Abbott v.</u>

<u>Abbott</u>, 560 U.S. 1, 9 (2010).

7.      ICARA implements the obligations of the United States under the Hague

Convention.  <u>Monasky</u>, 589 U.S. at 71-72.

8.      ICARA permits a parent claiming that a child has been wrongfully removed to, or

retained in, the United States to commence judicial proceedings under the Hague Convention by

filing a petition for the return of child in a state or federal court which has jurisdiction where the

child is located.  <u>Golan v. Saada</u>, 596 U.S. 666, 671 (2022); <u>Tsai-Yi Yang</u>, 499 F.3d at 270.

Consistent with the Hague Convention, ICARA "empower[s] courts in the United States to

determine only rights under the Convention and not the merits of any underlying child custody

claims." <u>Golan</u>, 596 U.S. at 671 (citing 22 U.S.C. § 9001(b)(4); Hague Convention art. 19).

**B.**     **Applicable Framework**

9.     Under the Hague Convention, the petitioner has the burden to prove, by a preponderance of the evidence, that the child has been wrongfully removed or retained.  22 U.S.C. § 9003(b), (e)(1)(A); Blackledge, 866 F.3d at 177–78.

10.     The removal or retention of a child is wrongful if:

    a.  it is in breach of rights of custody attributed to a person ... under the law of the State in which the child is habitually resident immediately before the removal or retention; and

    b.  at the time of removal or retention those rights were actually exercised ... or would have been so exercised but for the removal or retention.

See id. (citing Hague Convention, art. 3).

11.     To determine if a petitioner is entitled to relief, a court must answer four questions: "(1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention." Blackledge, 866 F.3d at 178; Tsai-Yi Yang, 499 F.3d at 271; Karkkainen, 445 F.3d at 287.

12.     In this case, the parties stipulate that Petitioner has rights of custody that he was exercising at all relevant times.  Therefore, only the first two prongs of this inquiry (retention date and habitual residence) are at issue.  See Resp. Proposed Findings (Doc. 23) at 19.

13.     Even if the petitioner meets his burden, return of the child is a general rule, and there are exceptions.  Golan, 596 U.S. at 670.

14.     If the Court finds that a child was wrongfully retained, the burden shifts to the respondent to establish that an exception to the return requirement applies.  See id. at 672.  These

affirmative defenses must be "narrowly construed to effectuate the purposes of the Convention."
Monzon v. LaRoca, 910 F.3d 92, 97 (3d Cir. 2018).

15.     These exceptions include: (1) grave risk that return of the children would expose
them to physical or psychological harm; (2) violation of fundamental principles of the requesting
State relating to the protection of human rights and fundamental freedoms; (3) delay more than
one year after the children have become settled in a new environment; or (4) consent or
subsequent acquiescence by the petitioner to the removal or retention. The first two exceptions
must be proved by clear and convincing evidence, while the latter two need only be proved by a
preponderance of the evidence. Hague Convention art. 12, 13, 20; 22 U.S.C. § 9003(e)(2).

16.     The consent/acquiescence defense is the only exception at issue here.[4]

17.     Because of "the very important policy objectives of the Convention and ICARA,"
courts retain the discretion to order the child's return even when a defense applies.  Monzon, 910
F.3d at 97.  "Absent a finding that an exception applies, a child determined to be wrongfully
removed or retained must be 'promptly returned' to the child's country of habitual residence."
Golan, 596 U.S. at 672 (citing 22 U.S.C. § 9001(a)(4)).

**C.     Retention Date**

18.     For purposes of the Hague Convention analysis, the "retention date" is "the date
beyond which the noncustodial parent no longer consents to the child's continued habitation with
the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally

---

[4] Mrs. Mirtti's Answer also references the "grave risk" exception. (Doc. 7).  Because she failed
to meaningfully pursue the grave risk exception at the hearing or in her proposed findings, the
Court deems the defense abandoned and does not discuss it here.  To the extent that Respondent
did not intend to withdraw the defense, she has failed to prove that defense by any standard, let
alone the exacting clear and convincing threshold required.  There simply was no evidence
introduced suggesting that anything about Mr. Mirtti or returning to Finland would expose the
children to physical or psychological harm.

communicated through words, actions, or some combination thereof." <u>Blackledge</u>, 866 F.3d at

179. This "determination is, by necessity, fact-intensive and will vary with the circumstances of

each case." <u>Id.</u> Although "in some cases the notice date and actual expiration date will coincide,

in other cases the notice will indicate a future date as the date consent will be withdrawn, in

which case that latter date, depending on the facts of the case, will constitute the expiration date

and, hence, the retention date." <u>Id.</u>

19.     Petitioner argues that the retention date is July 31, 2023, the date for which he

purchased one-way plane tickets to Finland for his family, and the date on which his visa was set

to expire. (Pet. Exs. 29, 30). The Court disagrees and finds that any retention within the

meaning of the Hague Convention occurred no earlier than December 8, 2023, when Petitioner

filed Requests for Return of the girls under the Convention. <i>See</i> <u>Blackledge</u>, 866 F.3d at 179.[5]

20.     As of July 31, 2023, the children had been living in the United States with one or

both parents for over a year, and neither party has claimed that Petitioner objected to the children

residing in the United States for that period of time. To the extent the parties initially disagreed

over whether Mrs. Mirtti and the girls would return to Finland at the end of Petitioner's visiting

professorship on July 31, 2023, the couple engaged in numerous discussions and negotiations

about their future in the months prior to that date, culminating in their July 19, 2023 written

agreement specifically stating that Respondent and the children "can continue to live in the USA

until [Petitioner] and [Respondent] agree otherwise." Although Petitioner has attempted to

downplay his role in drafting the agreement throughout this litigation, the credible testimony and

---

[5] Respondent argues that the correct retention date should be February 22, 2024, the date on which she received notice of Petitioner's Requests for Return. <i>See</i> Resp. Proposed Findings (Doc. 23) at 34-35. Because the December 8, 2023 date would not alter the Court's conclusions, the Court gives Petitioner the benefit of any doubt in this regard.

evidence introduced at the hearing revealed that Petitioner actively edited the written document, including the addition of numerous additional clauses, as well as proposed an Addendum that reiterated the agreement that the children could continue to live in the United States. Despite his significant revisions, Petitioner never changed the language quoted above.[6]

      21.     Petitioner's post-July 31, 2023 conduct further supports this finding.  After returning to Finland on that date, Petitioner continued to exchange regular friendly and cordial communications with Respondent, repeatedly emphasizing their desire to work on their relationship and remain together as a family.  Petitioner visited Respondent and the girls in the United States for an extended period in November 2023, during which time they acted as a family and even were intimate with each other.  Also consistent with the July 2023 agreement, the parties participated in marital counseling and Petitioner continued to seek out job opportunities in the United States, with Petitioner's assistance.  Additionally, Petitioner re-rented the family home in Espoo almost immediately upon his return and moved into an apartment.  At no time during the fall of 2023 did Petitioner demand that Respondent return the children permanently to Finland or otherwise disavow their mutual agreement through his words or actions.  The totality of this evidence is inconsistent with Petitioner's contrary arguments and consistent with both the July 2023 agreement and Respondent's testimony that Petitioner intended to return to Finland to wrap up his affairs there, pursue American work opportunities and ultimately rejoin his family in the United States.

---

[6] In addition to his failures to bring this language to the attention of the Court and other authorities, Petitioner further attempts to minimize its import by arguing that the clause applies only until and unless one of the parties changes their mind.  *See* Doc. 21 at 7-8.  This misplaced logic contravenes the plain language of the text, which clearly requires a mutual agreement between the parties.

22.     Petitioner's attempts to characterize the July 2023 agreement as a unilateral, "sham" agreement are unpersuasive, as are his efforts to characterize himself as an uneducated "layman" duped by his more legally-sophisticated attorney wife.  Although not a lawyer himself, Petitioner is a highly-educated professional who testified to his familiarity with contracts in the course of his employment.  Petitioner's intelligence, sophistication and understanding of the relevant legal framework were evident to the Court from his demeanor and testimony at the hearing.  Petitioner also testified that he first reached out to a child abduction NGO in May 2023, again evidencing some familiarity with the Hague Convention and its procedures.  Moreover, although an attorney by trade, there is no evidence that Respondent specialized in family law or Hague Convention matters at any time in her career.  These facts further belie Petitioner's suggestion that the events of July 2023 somehow reflect a unilateral, sophisticated scheme orchestrated by Respondent to take advantage of Petitioner's claimed naïveté. Petitioner's repeated attempts throughout this litigation to minimize or hide his active role in negotiating and drafting the parties' written agreement additionally discredit his testimony on these points.

23.     Finally, the Court rejects Petitioner's argument that Respondent's filing of a divorce petition on or about July 19, 2023, invalidates the parties' agreement or evidences a contrary intent.  Again, the Court finds credible Respondent's testimony that the service of the divorce petition was a "mistake" in the sense that she only proceeded with filing the petition after Petitioner initially balked at memorializing their agreement in writing.  Because Respondent's attorneys filed the divorce petition prior to or contemporaneous with Petitioner's signing of the agreement, it is probable, as Respondent testified, that it was then too late to halt service of the document.  Moreover, after discussions on the issue with Respondent, Petitioner continued to act in accordance with the July 2023 agreement, including drafting an addendum to the agreement

and corresponding with her counsel regarding the same. For her part, Respondent acted

consistent with her testimony that the parties decided to keep the Georgia action open so that

they could memorialize their maintenance agreement in writing.  Although Petitioner ultimately

declined to sign that paperwork in October 2023, Respondent held true to her promise to

withdraw the divorce petition in December 2023, and the parties remain married to this day.

**D.**     **Habitual Residence**

24.     The Court next must determine L.J.M. and E.A.M.'s "habitual residence"

immediately prior to the retention date.  *See* Feder, 63 F.3d at 222

25.      A child's habitual residence depends on the totality of circumstances specific to

each individual case.  Monasky, 589 U.S. at 71, 84.

26.     The Hague Convention does not define the term "habitual residence."  Id. at 76.

27.     The Supreme Court has clarified, however, that to be deemed "habitual" for

purposes of the Hague Convention, a child's place of residence must be "more than transitory."

Id.  "Habitual residence" is context-specific and requires "some degree of integration in a social

and family environment."  Id. at 77.  Simply put, the "place where a child is at home, at the time

of removal or retention, ranks as the child's habitual residence."  Id. (citing Karkkainen, 445

F.3d at 291).

28.     The Court of Appeals for the Third Circuit has defined "habitual residence" as

"the place where [the child] has been physically present for an amount of time sufficient for

acclimatization and which has a degree of settled purpose from the child's perspective." Baxter v.

Baxter, 423 F.3d 363, 369 (3d Cir.2005); Tsai-Yi Yang, 499 F.3d at 271.  Although this inquiry

is child-focused, the courts also must consider the "parents' present shared intentions" regarding

their child's presence in the location at issue.  <u>Tsai-Yi Yang</u>, 499 F.3d at 271 (citing <u>Karkkainen</u>,

445 F.3d at 297);

      29.    The "inquiry into a child's habitual residence is a fact-intensive determination

that cannot be reduced to a predetermined formula and necessarily varies with the circumstances

of each case."  <u>Karkkainen</u>, 445 F.3d at 291; <i>see also</i> <u>Monasky</u>, 589 U.S. at 78 ("Because

locating a child's home is a fact-driven inquiry, courts must be 'sensitive to the unique

circumstances of the case and informed by common sense.'" (quoting <u>Redmond v. Redmond</u>,

724 F.3d 729, 744 (7th Cir. 2013))).

      30.    The drafters' choice of "habitual residence" as the foundation of the Hague

Convention's return remedy in lieu of more formal legal concepts such as "domicile" and

"nationality" was deliberate, so as to afford courts "maximum flexibility" to respond to each

case's particular facts.  <u>Monasky</u>, 589 U.S. at 78-79.  "The aim: to ensure that custody is

adjudicated in what is presumptively the most appropriate forum – the country where the child is

at home."  <u>Id.</u> at 79.

      31.    For older children capable of acclimatizing to their surroundings, facts indicating

acclimatization will be highly relevant.  <u>Monasky</u>, 589 U.S. at 78.  "Because children, especially

those too young or otherwise unable to acclimate, depend on their parents as caregivers, the

intentions and circumstances of caregiving parents [also] are relevant considerations."  <u>Id.</u>[7]  No

one factor, however, is dispositive across all cases; rather, each case depends on the totality of

---

[7] The Court of Appeals has not fixed a specific age at which acclimatization takes on a greater
significance, understanding that "it necessarily will vary depending on the maturity and cognitive
and social abilities of the child in question."  <u>Blackledge</u>, 866 F.3d at 181.  The Court has
recognized, however, that "a typical four-year-old child 'certainly has this ability' because [s]he
is 'able to develop a certain routine and acquire a sense of environmental normalcy' and is 'not
only aware of those around [her], but is able to form meaningful connections with the people and
places [s]he encounters each day.'"  <u>Id.</u>

the circumstances.  *See* id.; *see also* <u>Blackledge</u>, 866 F.3d at 180 (the district court is "required to consider both the parents' shared intent and the child's acclimatization"); <u>Karkkainen</u>, 445 F.3d at 296 (same).

32.     Among the factors courts have considered as indicative of acclimatization and a degree of settled purpose from the child's perspective are academic activities, school attendance, social engagements, development of relationships with extended family, excursions and participation in sports programs.  *See, e.g.*, <u>Karkkainen</u>, 445 F.3d at 293-94.

33.     Generally, courts will not find a change in habitual residence where "the evidence of shared parental intent reflects that the 'child's initial move from an established habitual residence was clearly intended to be for a specific, limited duration.'"  <u>Blackledge</u>, 866 F.3d at 180 (quoting <u>Whiting v. Krassner</u>, 391 F.3d 540, 549 (3d Cir. 2004)).  An exception to this general rule exists, however, when "a move, though temporary, carries 'a degree of settled purpose . . . , even if such purpose is only for a limited period.'"  <u>Id.</u> (quoting <u>Whiting</u>, 391 F.3d at 549).  Thus, the "concept of 'settled purpose' . . . does not require an intention 'to stay . . . indefinitely,' and may in fact be for a 'limited period,' precipitated by various motivations, including '[e]ducation, business or profession, employment, health, family or merely love of the place.'"  <u>Id.</u> (quoting <u>Feder</u>, 63 F.3d at 223-24).  "Regardless of the motivation for the location selected, or whether the stay was meant to be permanent or temporary, '[a]ll that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'"  <u>Id.</u>

34.     Applying these concepts to the case at hand, the Court finds that the children's "habitual residence" immediately prior to retention was the United States.

35.     As an initial matter, the Court agrees that the girls' habitual residence clearly was Finland prior to the family's relocation to Atlanta in July 2022. Finland was the country of their birth and their home for the entirety of their lives until that point. The evidence further reflects that the girls engaged in the typical routines of daily life in Finland, including attending school, participating in activities such as dance and swim class, playing with friends, and spending time with their step-siblings and paternal grandparents. Thus, the question becomes whether the girls' habitual residence changed from Finland to the United States prior to the retention date. *See* Karkkainen, 445 F.3d at 292.

36.     The Court appreciates that the parents dispute their shared intent regarding their initial move, with Petitioner arguing that the move to the United States was meant to be for a specific, limited duration of one year corresponding with the term of his visiting professorship, and Respondent contending that the intent was to test the waters in the United States with an aim towards potentially relocating there permanently. Even accepting Petitioner's position, however, the move carried with it a "degree of settled purpose" from the children's perspective. Id. at 182. Specifically, the evidence shows that the primary purpose for the parties' relocation was Petitioner's one-year position, and that both parents intended the family to put down roots in the United States for the entire year and take on the normal pattern of residential life in Atlanta, including renting a home in a residential community, enrolling the girls in school and daycare, visiting Respondent's family in Pennsylvania, celebrating holidays, and participating in sports programs and other typical childhood activities. *See* id. at 182-84; Whiting, 391 F.3d at 542-50; *see also* Blackledge, 866 F.3d at 180 (limited stays precipitated by motivations such as business, profession or employment may carry the requisite degree of settled purpose).

27

37.     To the extent Petitioner argues that the children's habitual residence could not

have changed to the United States because there was no intent to abandon Finland, this argument

is without merit.  See Blackledge, 866 F.3d at 182-23 (recognizing that "'abandonment,' as the

flipside of 'habitual residence,' c[an] also be for a 'definite and extended period,' i.e., until the

child resume[s] her habitual residence in the abandoned country, as scheduled" (quoting

Whiting, 391 F.3d at 550)); see also Whiting, 391 F.3d at 550 (explaining the same and rejecting

father's argument that Canada could not have become the child's habitual residence because

there was no shared intent to abandon the United States).

38.     Moreover, and in any event, before the end of July 2023, as evidenced by the

parties' words, actions, and signed agreement,[8] the parents jointly intended that the children

would remain in the United States with Respondent indefinitely unless and until they both agreed

otherwise, and that Petitioner would rejoin them upon finding suitable work in the United States,

after which they intended to reside in the United States together as a family.  Both parties

continued to act in accordance with that shared intent throughout the fall of 2023.

39.     For all of these reasons, the shared intent portion of the habitual residence

analysis favors the United States as the county of habitual residence immediately prior to any

retention.

40.     The record evidence of the children's acclimatization to the United States also

indicates that their habitual residence was there at the time of retention.  At the ages of 3 and 6 at

the time they left Finland, the girls both are of a sufficient age to demonstrate acclimatization to

---

[8] Although, as the Supreme Court clarified in Monasky, an actual agreement between the parents
is not necessary to establish a child's habitual residence, the presence of an actual agreement is
certainly a factor the courts may consider in conducting a totality of the circumstances analysis.
See Monasky, 589 U.S. at 71.

a new country, and there is no contention that either child lacked the maturity to do so. Although the children did not testify at the hearing,[9] the record is replete with undisputed testimonial, documentary and photographic evidence demonstrating that the children have flourished while living in both Atlanta and Warren.  As set forth above, the evidence of acclimatization includes attending elementary school (L.J.M.) and preschool (E.A.M.); earning high grades; spending time daily with extended family, including grandparents, aunts, uncles and cousins; going to birthday parties, swim parties and festivals; visiting amusement parks, the rodeo and other attractions; taking ice skating, swimming, golf and dance lessons; celebrating holidays and attending church services.  In addition, Respondent is a United States citizen, and both girls share dual Finnish and United States citizenship.  The girls were familiar with the United States prior to relocating to Atlanta and had developed relationships with their extended family in Warren through visits, video and telephone calls and other regular communication.

41.     For all of the above reasons, after considering the totality of the circumstances, including the parents' shared intent and the girls' acclimatization and degree of settled purpose, the Court finds that L.J.M. and E.A.M. were habitually resident in the United States at the time of the alleged retention.

---

[9] The children were not present in the courtroom, and neither parent requested that they testify during the hearing.  Indeed, the parents have represented to the Court that they intentionally have not discussed the matters at issue with or in front of the children.  Although courts certainly are permitted to question the children on the witness stand or *in camera*, there is no requirement that they do so, and the Court in this case respects the parents' wishes in this regard.  Nevertheless, the documentary evidence of record, as well as the parents' testimony, provides a sufficient picture of the girls' acclimatization for the Court to reach its conclusions on the issue.  In addition to the affirmative evidence of acclimatization cited above, there is no contrary evidence suggesting that the children failed to adjust to the United States or otherwise were not "at home" here at the time of retention.

42.     Because the children were habitually resident in the United States when Petitioner filed his request for their return to Finland, they were not wrongfully retained in violation of Article 3 of the Hague Convention, and the Court will not order their return.  *See* Karkkainen, 445 F.3d at 298.

**E.      Exception/Affirmative Defense to Return - Consent or Acquiescence**

43.     Given the above analysis, the Court need not address in detail Respondent's asserted affirmative defense of consent or acquiescence.  For the sake of completeness, however, and because Respondent bears the burden on this issue, the Court notes that, even if Petitioner could show a July 31, 2023 retention date, demonstrate that Finland remained the children's habitual residence, and/or otherwise establish a *prima facie* case, Respondent has proven, by a preponderance of the evidence, that Petitioner consented to Respondent's retention of the children in the United States prior to his return to Finland on July 31, 2023, and never withdrew that consent prior to filing his requests for return of the children on December 8, 2023.[10]  *Cf.* Gonzalez-Caballero v. Mena, 251 F.3d 789, 794 (9th Cir. 2001).

44.     As set forth more fully above, the evidence of Petitioner's consent includes both the agreement he negotiated and signed on July 19, 2023, and his words and conduct after that time, including proposing an addendum to the agreement which contained language confirming that the children would remain in the United States; pursuing marital counseling with

_____

[10] The affirmative defenses of consent and acquiescence are separate and distinct, although both are narrow.  The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention.  Baxter, 423 F.3d at 371. "Consent need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a). Often, the petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute.  The consent and acquiescence inquiries are similar, however, in their focus on the petitioner's subjective intent." Id.

Respondent as agreed; continuing his United States job search with Respondent's assistance; renting the family home in Espoo immediately upon his return; and engaging in regular, friendly conversations with Respondent expressing his desire to work on their relationship and find a job in the United States.  To the extent Petitioner harbored any concerns about the retention of the children during this time, he admitted at the Hearing that he kept any such concerns a secret from Respondent from the date of his departure until the date Respondent was notified of the Requests for Return that he filed in December 2023.

45.     Based on the foregoing Findings of Fact and Conclusions of Law, and in accordance with the Order issued on May 31, 2024 (Doc. 20), Judgment shall be entered in favor of Respondent and against Petitioner.  L.J.M. and E.A.M. are permitted to remain in the United States with Respondent pending the resolution of any custody proceedings in the appropriate forum.

IT IS SO ORDERED.


June 28, 2024                                        s/Cathy Bissoon
                                                    Cathy Bissoon
                                                    United States District Judge


cc (via ECF email notification):

All counsel of record